**BEFORE THE UNITED STATES JUDICIAL PANEL ON MULTIDISTRICT LITIGATION**

| | |
|---|---|
| IN RE: Secondary Ticket Market Refund Litigation | MDL No. 2951 |

**MOVANTS' CONSOLIDATED REPLY MEMORANDUM IN SUPPORT OF MOTION FOR TRANSFER OF ACTIONS TO THE NORTHERN DISTRICT OF ILLINOIS PURSUANT TO 28 USC § 1407 FOR COORDINATED PRETRIAL PROCEEDINGS**

Movants Matthew McMillan, Dustin Snyder, Lindsey Anderson, Timothy Nellis, Janel Dranes, and Lucy Sousa submit this Reply in support of their Motion for Transfer of Actions to the United States District Court for the Northern District of Illinois or, alternatively, to the Western District of Wisconsin.

Parties to the Actions filed five responses to the Motion for Transfer. For each of the Actions, either all plaintiffs, all defendants, or all parties agree that transfer of that action into an MDL is appropriate. The plaintiff in *Reynolds v. StubHub, Inc. et al.* (SDNY Case No. 1:20-CV-03508-AKH) did not file a response and is deemed to have acquiesced to the motion.[1] Two plaintiff groups oppose transfer, as do two of the defendants. And while they support coordination, the StubHub defendants assert that the cases against their competitors need not be coordinated with the cases in which they are named. But every party that opposes transfer of all Actions overlooks the most significant common questions of fact. Merely determining the scope of the classes in each of the Actions, which will require an event-by-event determination regarding cancelation status, will entail so many repetitive factual determinations that it alone would provide a sufficient basis for transfer. Yet there are numerous additional common issues that further support centralization

[1] "Failure to respond to a motion shall be treated as that party's acquiescence to it." JPML Rule 6.1(c).

because common issues need not be identical. If the Actions are not brought before a single judge, it will result in overwhelming waste.

## I. The Responses Fail to State a Coherent Basis for Declining to Centralize the Actions.

### *A. StubHub Defendants*

The StubHub defendants agree that the cases in which they are named should be transferred and coordinated since the later-filed actions are all derivative of *McMillan*. They rightly observe that "*McMillan* provides the best summary of the allegations because the remaining cases are essentially copies of the *McMillan* claim with slight variations." ECF No. 19, 3. They note that an additional pending state court matter in Iowa will soon be removed, which further counsels in support of transfer to one of the geographically central transferee venues suggested by Movants. *Id.,* 2. As the largest and most consequential of the defendants and as parties to six relevant actions (four of the Actions as well as *Demaray v. StubHub, Inc., et al.*, 05771 LACL 147998 (Polk County District Court, Iowa) and *Wood v. StubHub, Inc.* Case No. 3:20-cv-04125 (N.D. Cal.), a newer tag-along case) the StubHub defendants' support for coordination is particularly significant. They argue, however, that the Actions against their competitors should not be part of the MDL.

In opposing the inclusion of the other defendants, StubHub asserts that "[t]he User Agreement, which all of the plaintiffs suing StubHub invoke, is governed by California law; SeatGeek is governed by New York law; and Vivid Seats is governed by Illinois law." ECF No. 19, 4. Like its competitors, StubHub fails to contend with the fact that in the Vivid Seats and SeatGeek actions, the plaintiffs assert that the terms of service (and therefore their choice of law provisions) were never agreed to, lest the defendant could seek to force them into binding

arbitration[2] (which would ameliorate any concerns about moving forward under different states' laws).

Similarly, StubHub argues that factual variations will include "the status of each plaintiff's event, and the representations as to the treatment of various event types (that is, cancellation, postponement, etc.) by each different defendant. None of these issues can be answered with common proof or discovery across the various defendants." ECF No. 19, 4-5. But in fact the opposite is true. For each event that could potentially give rise to a purchaser's inclusion in the classes against any defendant, a determination will need to be made as to whether that event was cancelled or not. In addition to being an enormous task that will create the bounds of the litigation in each of the Actions, this is a straightforward, objective determination. No party can offer any basis to conclude that it will turn on the particular language of any defendant's guarantee or on subtleties of varying state law. It will, however, likely require documentary and testimonial discovery from hundreds of event organizers and primary ticketing entities across the country.

***B. Vivid Seats***

Vivid Seats erroneously asserts that (1) common issues must predominate over individual issues for transfer to be appropriate; and (2) that there are no common issues whatsoever amongst the actions, a position taken by no other party. It asserts that even if they did exist, any such common factual issues must 'predominate over individual questions of fact present in each action' for transfer to be justified." ECF No. 21, 18 (citing *In re Rely Tampon*, 533 F.Supp. 1346, 1347 (J.P.M.L. 1982). As an initial matter, *In re Rely Tampon* did not establish a predominance requirement. The MDL statute requires only that there be "one or more common questions of fact."

[2] Movants vehemently maintain that even if they had assented to the terms and conditions, the arbitration provisions contained therein are unenforceable.

28 U.S.C. § 1407(a). "There is no requirement that the common questions be 'identical,' or that they 'predominate,' or that they be 'central to' or 'determinative of' the controversy.'" Wright & Miller, Fed. Prac. & Proc. § 3863 (4th ed. 2018). Just as importantly, there are many common issues, which even the other defendants concede.

In denying the existence of *any* common issues of fact, Vivid Seats alleges that "Movants seek to use the COVID-19 pandemic -- which has impacted every person and business in the country -- to create common issues of fact where none otherwise exists." ECF No. 21, 8. It stresses that "The six actions are brought by different Plaintiffs who purchased tickets to different events, and the Defendants are different too." *Id.* "None of the Plaintiffs in the StubHub Actions or the SeatGeek Action, however, bought tickets to the [same events of the Vivid Seats plaintiffs] much less through Vivid Seats." In putative nationwide class actions spanning tens of thousands events, it is particularly unavailing that Vivid Seats would highlight that the plaintiffs purchased tickets to different events. It adds that "Plaintiffs in the separate actions variously allege that each Defendant knowingly and intentionally made false promises and failed to honor its refund policy to its customers. But the alleged marketing and advertising are entirely unique to each Defendant, as are each Defendant's knowledge and intent." ECF No. 21, 9.

Vivid Seats overlooks the fact that substantial discovery regarding cancelled events will need to be taken from third parties, asserting that "[d]ocument discovery would clearly be specific to each Defendant … Each Defendant also has its own employees, and thus, there would also be no overlap in witnesses" ECF No. 21, 24. It stresses the fact that the various defendants are competitors, but fails to indicate how any sensitive information would likely be made available to those competitors given the nature of the Actions. ECF No. 21, 24. As addressed below, none of these purported individual issues creates a bar to centralization.

### *C. SeatGeek*

In one of many contradictions of Vivid Seats, SeatGeek concedes that there are indeed common issues. "While there may be a few overlapping issues, such as when a particular event was cancelled, they are not the kind of complex fact questions needed to justify consolidation of a small number of cases and can be addressed through voluntary cooperation." ECF No. 20, 2. It claims that "would be severely inconvenienced if the SDNY Action were moved to a distant jurisdiction and bogged down by the involvement of parties—including its main competitors—who have absolutely nothing to do with the claims asserted against SeatGeek." *Id.* Yet as StubHub acknowledges, in 2020 concerns about distance are less relevant than ever. "[A]s courts and parties shift more to the use of electronic document transfers, ESI discovery, and video status and depositions, StubHub does not foresee the location of documents as problematic. As a primarily online company, StubHub is confident that the location of physical records is not an important consideration in the StubHub Actions. Because of the wide-variety of locations of the various plaintiffs and witnesses, a centralized location is more efficient and equitable for transfer than is StubHub's office or any one plaintiff." ECF No. 19, 17-18.

SeatGeek contends that the Actions do not "involve 'industry-wide' practices, much less a single specific practice." ECF No. 20, 11. Yet in seeking to draw distinctions between the various defendants, SeatGeek actually provides support for just how similar the Actions are. It asserts that "each defendant's response to the issues they faced as a result of the pandemic was different" because

> [1] On or about March 12, 2020, StubHub announced that it would issue a 120% credit instead of a refund when an event was cancelled, regardless of the purchase date.

> [2] On or about March 13, Vivid announced that it would give a 110% credit and make a 10% charitable donation unless the customer contacted customer service within seven days for a full refund.
> [3] SeatGeek changed its terms of service on or about March 16, 2020, in order to have the flexibility to offer a refund or a credit.

ECF No. 20, 4. In other words, within a three day stretch, three nearly identical businesses all changed their terms of service to purportedly terminate (nearly identical and heavily advertised) refund obligations in favor of providing (nearly identical) useless credits. It is not the similarities here that are superficial, but the differences.

SeatGeek raises the same concerns about being involved in an MDL with its competitors as does Vivid Seats, but admits that "a protective order would ameliorate those issues to some extent[.]" ECF No. 20, 5. Just as Vivid Seats erroneously asserts that common issues must "predominate" over individual ones, SeatGeek invents a requirement that those common issues be sufficiently complex to warrant coordination. Where Vivid Seats focuses on the apparent complexity of varying claims under potentially different states' laws, SeatGeek paints the Actions as "simple breach of contract disputes" which "lack the complexity to warrant centralization." ECF No. 20, 5.

The two cases cited by SeatGeek to support its assertion that there must be a high degree of complexity to common issues prove how low the "complexity" bar is, if it even exists. In *In re Commercial Lighting Prods., Inc. Contract Litig.*, 415 F. Supp. 392, 393 (J.P.M.L. 1976), the Panel noted that "Only two relatively simple contract and tort actions are before us. While we recognize that these actions share common questions of fact, we are not persuaded that the common factual questions are complex enough to warrant transfer." Similarly, in *In re Mt. Vernon, Ill., Times Square Shopping Ctr. Contract Dispute Litig.*, 405 F. Supp. 310, 312 (J.P.M.L. 1975), the Panel observed that "[o]nly two relatively simple contract actions are before us. And movant has failed

to demonstrate that they raise common factual questions complex enough to warrant transfer." The Actions are not simply contract actions, and the common factual questions are much more complex than were at issue in either of SeatGeek's proffered authorities.

### *D. Alcaraz*

Plaintiff Alcaraz filed a short opposition noting his opposition to the motion and focuses largely on the existence of three sets of defendants. He claims that the Actions "involve five different defendants and significantly different claims." ECF No. 18, 1. Mr. Alcaraz also asserts that "litigating the claims against all three companies in one consolidated action will actually create significant inefficiencies as the Court and the parties will have to constantly be concerned with sorting out which issues overlap and which do not." This appears to be an admission that many issues are indeed common across the Actions.

Plaintiff *Alcaraz* also argues against a StubHub-only MDL, while nearly arguing in support of it. He recognizes that the cases against the StubHub defendants should proceed in a single court, but claims that transfer to the Northern District of California "by agreement or under 28 U.S.C. § 1404" would be superior to granting Movants' 28 U.S.C. § 1407 request. *Id.* at 3. This seems to be based on little more than the location of his counsel's office, and bears little weight given StubHub's own acknowledgement that a geographically central location better suits the needs of this litigation.

### *E. Kopfmann*

The single plaintiff in *Kopfmann*, the other copycat case pending in the Northern District of California, also primarily focuses on the purported impropriety of including cases against non-StubHub defendants in any MDL. She acknowledges that the "lawsuits against StubHub share much in common." ECF No. 22, 2. She suggests that "if centralization is ordered… that the

[previously] four StubHub cases be centralized in the Northern District of California, where StubHub is based and two of the [previously] four cases against StubHub are already pending." *Id.*, 3. Plaintiff *Kopfmann* asserts, however, that centralization is unnecessary because "Once the respective arbitration motions are decided, there may no longer be a need for coordination." *Id.*, 5. In fact, this highlights why coordination is so important – so that one plaintiff's case is not prejudiced by potentially dispositive motion practice in another without a full opportunity to be heard. She adds that she "does not expect that much if any coordination between the StubHub cases and the SeatGeek case or the Vivid Seats case will prove necessary, those cases involve the same counsel as the *McMillan* StubHub case, who can help ensure that any potential for duplication of efforts is minimized." *Id.*, 6.[3]

## II. The Parties Opposed to Transfer Fail to Address the True Significance of Common Issues. Transfer Will Promote Judicial Economy and Convenience for the Parties Despite the Concerns Raised in Opposition.

### *A. Determining the Bounds of Each Class, and Therefore Which Events Were Cancelled, is a Time-Consuming Common Factual Determination That Constitutes a Threshold Issue for Many Class Members.*

In order to merely determine which customers fall into each of the putative class definitions, it will be necessary to answer a number of questions that all depend on the same factual underpinnings. What constitutes a cancelled event? Is it when it is announced that the event will not occur as scheduled? Or when the scheduled date passes and the event has not occurred? Is whether a "replacement" date has been announced a threshold issue? What if that date is later vacated? What if the date is set for a time and place that make its occurrence unlikely given the pandemic? How long can an event be indefinitely postponed before it must be considered

[3] This would seem to be in tension with her efforts to have her counsel appointed as sole interim class counsel. *Alcaraz*, CAND Case No. 4:20-cv-02595-HSG, ECF No. 20.

canceled? What if it is set to occur in a different year? At a different venue? In a different athletic "season?" On a different concert tour?

Each of these questions is enmeshed in the analysis that will be necessary to determine which of the tens of thousands of events to which potential class members hold tickets would qualify its ticket-holders as class members. It is likely to require discovery from ticketing companies, and countless organizers of sporting events, concerts, music festivals, comedy shows, and more. No party has offered any effective remedy for this problem short of transfer. That movants share counsel is no remedy where different courts could make different legal determinations that would apply the varying factual scenarios differently in addition to wasting resources.

### B. *Common Issues are not the Same as Identical Issues. The Similarity of Defendants' Businesses and the Conduct Alleged is Sufficient to Create Efficiencies Warranting an MDL.*

The Panel has recognized that when actions involve allegations of similar businesses engaged in similar (or as here, nearly identical) conduct, there are common questions sufficient to warrant coordination. For example, in *In re Daily Fantasy Sports Mktg. & Sales Practices Litig.*, 158 F. Supp. 3d 1375 (J.P.M.L. 2016) ("*Daily Fantasy Sports*") the panel ordered transfer and coordination of actions seeking the return of money from the major players in the daily fantasy sports industry, despite the facts that they were different companies, had acted in purportedly different ways, had differing terms and conditions with differing arbitration clauses, and that the plaintiffs had brought their causes of action under a variety of theories. What mattered was that "all of the actions involve plaintiffs seeking similar relief from the DFS Defendants—namely, refunds of the losses that plaintiffs sustained while participating in the online daily fantasy sports contests. Centralization, therefore, will eliminate duplicative discovery, prevent inconsistent pretrial rulings, particularly with respect to class certification, and conserve the resources of the parties, their counsel, and the judiciary." *Id.* at 1379. In those cases, "the actions [involved] common discovery

regarding the nature of the DFS Defendants' online daily fantasy sports contests, their advertising and promotions, and their internal policies and practices." *Id.*

In *Daily Fantasy Sports* the panel observed that "as with any MDL, the transferee judge may account, at his discretion, for any differences among the actions through the use of appropriate pretrial devices, such as separate tracks for discovery or motion practice … Should the transferee judge determine that discovery and other pretrial proceedings related to the common issues has been completed, he may suggest Section 1407 remand of actions to their transferor courts for more individualized discovery and trial, if necessary." *Id.* at 1379-80.

Here, to again borrow from SeatGeek, within a three day stretch, three nearly identical businesses all changed their terms of service to purportedly terminate (nearly identical and heavily advertised) refund obligations in favor of providing (nearly identical) useless credits. Just as in *Daily Fantasy Sports*, each defendant ran its own "advertising and promotions" and "internal policies and practices." But that is where the differences end, and those differences are not sufficient to outweigh the efficiencies observed by the panel in *Daily Fantasy Sports,* which apply with equal or greater force here because of the functionally identical nature of the defendant businesses and their shared, self-imposed vulnerability to cancelations. For example, Plaintiff *McMillan* alleges of StubHub that

> Defendants' procedure for paying sellers for tickets before the event had occurred created an apparent shortage of operational cashflow for it, rendering it unable to honor its contractual obligations.
> As noted by one media outlet in describing its 'liquidity crisis,' 'Stubhub and competitor sites like Vivid Seats … allow brokers to collect proceeds from the sale of tickets after the transaction, instead of waiting until the event or concert took place. Anticipating a massive influx of requests for refunds, Stubhub has changed how brokers are paid …And instead of refunds, buyers of tickets for canceled events will now be given a credit on Stubhub for 120% of the original ticket, according to an email from a company representative.'

ECF No. 1-4, ¶¶ 43-45. Similarly, the *Nellis* Plaintiffs allege of Vivid Seats that

> The problem [with Vivid Seats' business model] is apparent to any thinking person. If Vivid Seats has already paid the seller for the tickets, but the event still has not

> occurred, it will have to come up with the money on its own if it needs to honor the 100% Buyer Guarantee in the event of a cancellation. The more cancellations that occur, the more money Vivid Seats needs to come up with.

ECF No. 1-7, ¶¶ 28-29. And of SeatGeek's functionally identical business model, the Plaintiffs in that case allege that

> The problem here is apparent. If SeatGeek has already paid the seller for the tickets, but the event has not occurred, it must keep a reserve of funds, or come up with the money on its own in the event that it needs to honor the SeatGeek Buyer Guarantee in the event of a cancellation. The more cancellations, the more SeatGeek needs to reserve or acquire.

ECF No. 1-8, ¶ 30. The striking similarities in the conduct alleged of defendants places the Actions on all fours with *Daily Fantasy Sports*. "[A]ll of the actions involve plaintiffs seeking similar relief from the [secondary ticketing market] Defendants—namely, refunds of the losses that plaintiffs sustained [when their events were cancelled]. Centralization, therefore, will eliminate duplicative discovery, prevent inconsistent pretrial rulings, particularly with respect to class certification, and conserve the resources of the parties, their counsel, and the judiciary." *Id.* at 1379.

### C. *That There Are Three Different Groups of Defendants Which Acted in Nearly Identical Ways is No Bar to Transfer and Coordination.*

The parties opposing coordination of all Actions devote substantial attention to the fact that there are three separate sets of defendants, and that two of those sets are named in only one Action each.[4] They emphasize that the different defendants have different terms of use (which in many cases are alleged not to apply), advertising campaigns, and guarantee language. But there are far more similarities than differences, and even where cases present "unique questions of fact," centralization is appropriate if it will "permit all actions to proceed before a single transferee judge

---

[4] "[I]t is not uncommon" for an opponent of transfer to be a party in only one action. *In re Commonwealth Oil/Tesoro Petroleum Sec. Litig*., 458 F. Supp. 225, 229 (J.P.M.L. 1978).; *see also In re Proton-Pump Inhibitor Prods. Liab. Litig. (No. II)*, 261 F. Supp. 3d 1351, 1354 (J.P.M.L. 2017) ("Proton-Pump II") (granting MDL treatment where constituent cases presented common questions of fact, even though they involved multiple defendants and multiple products and some defendants were named only in a small number of cases).

who can structure pretrial proceedings in a streamlined manner to consider all parties' legitimate discovery needs, while ensuring that common parties and witnesses are not subjected to duplicative discovery demands." *In re Rembrandt Techs., LP, Patent Litig.*, 493 F. Supp. 2d 1367, 1369 (J.P.M.L. 2007). The transferee judge has "the authority to group the pretrial proceedings on different discovery tracks according to the common factual issues or according to each defendant if necessary for the just and efficient conduct of the litigation.*" In re Merrill Lynch Auction Rate Sec. Litig.*, 2010 U.S. Dist. LEXIS 12764, at *17 (S.D.N.Y. Feb. 8, 2010) (quoting *In re Multi-Piece Rim Prods. Liab. Litig*., 464 F. Supp. 969, 974 (J.P.M.L. 1979)). And "[t]he transferee court can employ various pretrial management techniques—such as scheduling discovery and other pretrial proceedings on any issues unique to a particular action or party on a separate track concurrently with the common pretrial proceedings—to avoid undue delay and to enhance the efficient conduct [of] this litigation." *In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Prods. Liab. Litig.*, MDL No. 2775, Dkt. 373 at 1 (J.P.M.L. Oct. 3, 2018); *see also In re 100% Grated Parmesan Cheese Mktg. & Sales Practices Litig*., 201 F. Supp. 3d 1375, 1376 (J.P.M.L. 2016) ("the transferee judge can accommodate any issues involving the different products and defendants … in a manner that guarantees the just and efficient resolution of all cases"); *In re: Satyam Computer Servs., Ltd., Sec. Litig.,* 712 F. Supp. 2d 1381, 1382 (J.P.M.L. 2010) ("Section 1407 . . . does not require a complete identity or even majority of common factual and legal issues as a prerequisite to centralization. Transfer [places] all actions . . . before a single judge who can formulate a pretrial program that . . . allows discovery with respect to any non-common issues to proceed concurrently with discovery on common issues"); *In re: Glaceau VitaminWater Mktg. & Sales Practices Litig*., 764 F. Supp. 2d 1349, 1350–51 (J.P.M.L. 2011)

(consolidating cases despite unique issues of fact and law, because of "the existence of numerous common factual issues among [the] actions").

Transfer of an action "is appropriate if it furthers the expeditious resolution of the litigation taken as a whole, even if some parties to the action might experience inconvenience or delay." *In re Smith & Nephew Birmingham Hip Resurfacing (BHR) Hip Implant Prods. Liab. Litig*., MDL No. 2775, Dkt. 373 at 2 (J.P.M.L. Oct. 3, 2018). "If discovery on the questions of fact involving the defendant is tied to other common discovery, the claims against the peripheral party are properly transferred." Wright & Miller, Fed. Prac. & Proc. § 3863 (4th ed. 2018). Any "concerns regarding the manner and extent of coordination or consolidation of the pretrial proceedings can be presented to the transferee judge." *In re Checking Account Overdraft Litig*., 626 F. Supp. 2d 1333, 1335 (J.P.M.L. 2009). Sufficient mechanisms are available to the transferee court to nullify each of the concerns raised in opposition to transfer. The presence of differing defendants does not justify conducting an enormous amount of repetitive discovery and motion practice in the face of such similar allegations involving the same pool of cancelled events.

## III. The Northern District of Illinois and the Western District of Wisconsin are More Appropriate Venues Than the Northern District of California.

StubHub's position is that "While the Western District of Wisconsin, where the first-filed action is pending, is the most appropriate and central forum, a central geographic forum is the most important factor in the StubHub Actions because the actions are national class actions, with no nexus to any given state... Thus, StubHub consents to transfer and consolidation in the Northern District of Illinois as an alternative to the Western District of Wisconsin—and agrees with Movants that the Northern District of Illinois would be a suitable alternative forum for the StubHub Actions." ECF No. 19, 18. While opposing centralization, Vivid Seats acknowledges that "centralization before Judge Robert M. Dow, Jr. or another judge in the United States District

Court for the Northern District of Illinois is most appropriate[.]" ECF No. 21, 27 FN 18. The *Alcaraz* and *Kopfmann* plaintiffs both state a preference for the Northern District of California, though Mr. Alcaraz asserts that transfer should be under 28 U.S.C. § 1404. ECF No. 18, 3; ECF No. 22, 6.

As noted by StubHub, in addition to being home to the first-filed case, "[t]he Western District of Wisconsin is not currently burdened with an MDL and has a much faster time-to-trial than any other federal court in which a StubHub action is currently pending." ECF No. 19, 13. The Panel often selects transferee districts that have the support of defendants common to multiple actions. See *In re Stryker Rejuvenate, ABG II Hip Implant Prod. Liab. Litig*., 949 F. Supp. 2d 1378, 1380 (J.P.M.L. 2013) (noting that the chosen district "has the support of the common defendants"); see *also In re Ortho Evra Prod. Liab. Litig*., 422 F. Supp. 2d 1379, 1381 (J.P.M.L. 2006) (noting that "[t]his district enjoys the support of the common defendants and several plaintiffs.").

The Northern District of California is a much less appropriate venue because the putative classes in the StubHub actions will likely exclude many California consumers. *See* ECF No. 1-4, ¶ 41 ("Defendants continue to represent that they will give actual refunds to customers in states where it is required by law. Upon information and belief, Defendants mean this to include California, Connecticut, Florida, Hawaii, Iowa, Maryland, Massachusetts, Minnesota, New Jersey, New York, Ohio, Rhode Island, Utah, and Virginia."); *see also "Can you get a refund for sports, concerts and other events disrupted by coronavirus? It depends"* – Los Angeles Times, April 20, 2020[5] (*"*In some states that have laws requiring companies to refund consumers for canceled events, including California, customers can still obtain a refund from StubHub if they explicitly

[5] Available at https://www.latimes.com/sports/story/2020-04-20/sports-concert-events-ticket-refunds-coronavirus (last visited June 29, 2020).

request one.”). There is no reason to transfer the Actions to a district court on the basis that two copycat class actions were filed there, where it sits in a state in which few if any Class members reside and is not requested by the only defendant to reside in that state. As StubHub notes, “[b]ecause of the wide-variety of locations of the various plaintiffs and witnesses, a centralized location is more efficient and equitable for transfer than is StubHub’s office or any one plaintiff.” ECF No. 19, 17-18.

## CONCLUSION

The defendants likely oppose inclusion of all Actions in a single MDL because a single judge will be unmistakably confronted with the fact that their entire exploitative industry was built on promises that the defendants could not keep. Given the number of cancelled events, simply determining the bounds of the putative classes will be a herculean task that should be determined efficiently and uniformly in a single proceeding. The various concerns raised by the defendants regarding any variations in the Actions can be readily addressed by the transferee judge and are outweighed by the efficiencies of consolidation. Movants Matthew McMillan, Dustin Snyder, Lindsey Anderson, Timothy Nellis, Janel Dranes, and Lucy Sousa therefore request that the Panel transfer the Actions and any tag-along cases to the United States District Court for the Northern District of Illinois or, alternatively, to the Western District of Wisconsin. Alternatively, and with the support of StubHub, those actions naming StubHub as a defendant should be so transferred.

DATED: June 29, 2020

Respectfully submitted,

**LIDDLE & DUBIN, P.C.**

s/ Nicholas A. Coulson
Steven D. Liddle
Nicholas A. Coulson
975 E. Jefferson Avenue
Detroit, Michigan 48207

Tel: 313-392-0015
Fax: 313-392-0025
sliddle@ldclassaction.com
ncoulson@ldclassaction.com

*Attorneys for Matthew McMillan, Dustin Snyder, Lindsey Anderson, Timothy Nellis, Janel Dranes, and Lucy Sousa*